# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 2, 2010

## STATE OF TENNESSEE v. TERRY LYNN CRAFT

**Appeal from the Circuit Court for Madison County**
**No. 08-678      Roger Page, Judge**

---

**No. W2009-02049-CCA-R3-CD  - Filed August 26, 2010**

---

Following a jury trial, the Defendant, Terry Lynn Craft, was convicted of two counts of vehicular homicide by intoxication, a Class B felony.  See Tenn. Code Ann. § 39-13-213(b)(2).  In this direct appeal, he contends that: (1) the State presented evidence insufficient to convict him; and (2) the trial court violated the hearsay rule in admitting a recording of a 911 call.  After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Paul E. Meyers, Assistant Public Defender, Jackson, Tennessee, for the appellant, Terry Lynn Craft.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Jerry Woodall, District Attorney General; and Anna Cash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The events underlying this case began on June 9, 2008.  Buddy Norvell, an employee of the City of Jackson Central Dispatch, testified that he acted as custodian of all 911 calls made in the area.  He played at trial a recording of a 911 call received at 9:22 p.m. on June 9 from a truck driver named James Miller.  It was transcribed into the record as follows:

[911 Operator]: State Highway Patrol Office.

[Mr. Miller]: Yes. I'm a truck – truck driver and I'm on I-40 at mile marker 77. We just had this guy – I don't know if he was drunk or what. He just come flying up the road behind one car and about ran into the back of him, then he about sideswiped me, and then he took off again and he just ran into the back of another car and just crashed.

[911 Operator]: He did crash?

[Mr. Miller]: Yes, he did crash. He's at mile marker 77.

[911 Operator]: Okay, sir. Which way are you traveling?

[Mr. Miller]: I'm going west.

[911 Operator]: Was he westbound also?

[Mr. Miller]: Yes, he was. But he done went all the way across the interstate to the eastbound side.

[911 Operator]: He went to the eastbound side?

[Mr. Miller]: Yes. He was doing about a hundred and fifty when he came out of (inaudible). He was flying and he about ran into a car beside me. Then he squeezed around on the shoulder and cut across and about hit me, and – and just took off flying, disappeared again, and ran into the back of another car.

[911 Operator]: Okay. Do you know if anybody's hurt?

[Mr. Miller]: I – It don't look like – It look like he probably will be.

. . . .

During cross-examination of Mr. Norvell, the Defendant introduced a portion of a statement Mr. Miller later made to Agent Don Moore of the Tennessee Highway Patrol ("THP") Department of Safety Criminal Investigations Division:

[Mr. Miller]: Okay, I was traveling westbound on 40 right there at, uh, around mile marker 79 and I was going around another car. I was in the left lane.

And all of a sudden a car come off of getting on the get-on ramp off of 412 on to 40 going west at a high rate of speed. He come up behind the car that I was passing, just about ran in it, hit his brakes, kind of swerved, about hit my trailer. The car that I was going around kind of sped up to let the car out from behind him and he cut in between me and that car and then all of a sudden sped up and then just a few seconds after that I was trying to call 911 to let them know they had a drunk driver on the road he ran into the back of another car and his car kind of went up in the air and kind of slid sideways. I drove straight on through it. It was a bunch of debris all over the road and I could see his car sitting there off on the side there, in the middle of the road there, off to the shoulder there. And then I was on the phone with the 911 operator telling them what happened at that time.

[Agent Moore]: Okay, when you say the car sped on from the get on ramp at the 412 at the 79 can you tell me what kind of car it was and maybe what color?

[Mr. Miller]: I think it was a grayish colored car, like a, it was a GM, like an Oldsmobile or a Chevrolet, like a medium or compact size car.

[Agent Moore]: When you say "high rate of speed" can you estimate the speed that you would guess that this vehicle was traveling?

[Mr. Miller]: He had to be doing at least, at least 80 miles an hour if not a little faster.

[Agent Moore]: When the car entered from the ramp could you tell anything about the occupants of the car?

[Mr. Miller]: All I could see was a young white, looked like a white male was in the driver's seat. I couldn't tell if he had a passenger or not.

[Agent Moore]: The vehicle that was struck by this vehicle, can you tell me what kind of car it was or vehicle it was?

[Mr. Miller]: It was a Ford Explorer.

[Agent Moore]: Do you remember what color it was?

[Mr. Miller]: No, sir.

[Agent Moore]: Do you remember which lane the impact occurred in?

[Mr. Miller]: It looked like he was in the left lane what it looked like. Like I said, he'd done took off and he was about a quarter of a mile ahead of me when he took off when he all of a sudden hit the other vehicle.

[Agent Moore]: Do you know about what mile marker or where this crash occurred at?

[Mr. Miller]: It was right between the 78 and the 77.

[Agent Moore]: Are you one hundred percent positive that this is the same vehicle that had entered the 412 ramp on to 40 that made this collision?

[Mr. Miller]: Oh, yes, sir.

. . . .

[Agent Moore]: Okay. Could you tell of any kind of debris or anybody else's actions that were driving west bound on 40 that night that might cause this vehicle to act in the manner it did?

[Mr. Miller]: No, no, he was all at his fault, just driving too fast. He just come up on it too quick.

. . . .

[Agent Moore]: Did you see any animals or anything that might have caused this vehicle to react in the way that it did?

[Mr. Miller]: No, sir.

Kenneth Hilliard testified that his mother, Gayla Hilliard, and his father-in-law, James Mullins, died in the crash at issue. They had left Mr. Hilliard's residence in Jackson sometime after 8:00 p.m. on June 9. Mr. Mullins drove the Ford Explorer away from Mr. Hilliard's house. On June 10, Mr. Hilliard was notified of the crash by phone, informed that Ms. Hilliard had died at the scene, and told that Mr. Mullins was in the hospital. Mr. Hilliard visited Mr. Mullins, finding him in critical condition. Mr. Mullins died about three days later.

-4-

THP Trooper Tracey Stanfill testified that he responded to the scene of the crash on the evening of June 9. The crash appeared to have occurred in the right westbound lane of Interstate 40. A truck driver directed Trooper Stanfill to a gold Oldsmobile Alero at rest in an area of tall grass just south of Interstate 40. Approaching the vehicle, Trooper Stanfill observed the Defendant in the driver's seat. The Defendant had a cut above his right eye, smelled of alcohol, and was generally physically impaired and unresponsive. He said, "I hit something," but did not say anything else. There was evidence of impact to the front of the Alero, including an indentation consistent with a round trailer hitch.

Between ten and fifteen minutes later, Trooper Stanfill approached the victims' blue Ford Explorer just north of Interstate 40. Other troopers were already present around the vehicle. Trooper Stanfill saw that the man in the driver's seat, Mr. Mullins, had both of his feet hanging out the driver's side window. Mr. Mullins was not wearing his seat belt; Ms. Hilliard was wearing hers. She was unresponsive. Mr. Mullins said, "Something hit me." The Explorer had damage indicating that it had rolled over, as well as damage to its rear. It was equipped with a round trailer hitch.

Trooper Stanfill said that he later arranged for blood to be drawn from the Defendant at Madison County General Hospital using a standard blood sample kit. Registered nurse Richard Williams drew the blood, and established the events surrounding his portion of the chain of custody of the Defendant's blood. THP Trooper Thomas Joyner acted as evidence custodian, and established the blood's chain of custody between the time of the crash and its delivery to the Tennessee Bureau of Investigation on June 10.

Registered Nurse and Assistant Coroner Rita McCoy testified that she worked as a Certified Death Investigator, responding to the scene of the crash at issue for the purpose of investigating the crash and determining the cause and manner of any deaths. She responded to the scene on June 9; Mr. Mullins had already been transported to the hospital, but the body of Ms. Hilliard was still in the passenger's seat of the Explorer. Nurse McCoy observed numerous lacerations and abrasions on Ms. Hilliard's body, as well as bruising to her chest and groin area. Nurse McCoy opined that the victims' Explorer had rolled over "multiple times" before coming to rest in an area of brush and trees off Interstate 40. She listed Ms. Hilliard's cause of death as "multiple trauma" and manner of death as "motor vehicle collision."

Doctor Feng Li, an Assistant Davidson County Medical Examiner, testified that he performed an autopsy on Ms. Hilliard. In addition to her external injuries, Dr. Li noted an extensive hemorrhage under her scalp as well as lacerations to her brain. He also detected multiple bone fractures.

Doctor Tony Emison, Madison County Medical Examiner and Director of the Madison County Health Department, testified regarding Mr. Mullins' injuries using test results and records generated during Mr. Mullins' time in the hospital. No autopsy was performed. Dr. Emison said that Mr. Mullins sustained multiple bone fractures, multiple instances of blunt force trauma, and injuries to his chest, pelvis, and internal organs. He died from these injuries. Dr. Emison noted that Mr. Mullins had Celexa and Wellbutrin in his system at the time of death; he said Celexa could affect motor functions and cause drowsiness under some circumstances. Such drugs did not necessarily impair Mr. Mullins, however.

TBI Special Agent and Forensic Scientist Bethany McBride established her portion of the chain of custody of the Defendant's blood. The blood sample had been taken from the Defendant at 11:58 p.m. on June 9; her testing revealed a blood alcohol level of .15%.

THP Trooper Chris Lee was certified as an expert in crash reconstruction. He arrived at the scene of the crash at about 10:00 p.m. on June 9. He observed that the accident had occurred in the right lane of Interstate 40 westbound. He estimated that the victims' Explorer had been traveling at a minimum of sixty-six miles per hour at the time of impact. He could not say whether the Explorer had moved into the right lane shortly before the crash, but noted that it had been traveling completely straight at the time of impact. The Defendant's Alero had been steering slightly to the left in a probable attempt at evasive action.

Trooper Lee also testified about information he gleaned from examination of the "black box" installed in the Defendant's Alero; the box was programmed to save information about the five seconds preceding an airbag deployment. The Defendant's airbag had deployed. Trooper Lee learned that the Alero's brakes had been applied one second before the crash, bringing its speed down to seventy-eight miles per hour at the time of impact. In the four preceding seconds, the Alero had been traveling at a uniform ninety-nine miles per hour. Trooper Lee's examination of both vehicles revealed that the Alero had forced itself under the back of the Explorer, removing the Explorer's back tires from the road and depriving Mr. Mullins of control over the vehicle. Trooper Lee opined that the crash was the Defendant's fault: he believed the Defendant "ran up on something too quick and didn't have time to do anything about it." The proximate cause of the crash was "speed and alcohol."

On cross-examination, Trooper Lee noted that the Explorer's front left tire was a Firestone that had been subject to recall in California in 1994; he said that there was no evidence that any tire defect contributed to the crash, however. He also noted that the victims had bought the Explorer for $2,450 and that he had no information about whether a safety inspection had been done before the purchase. He also did not know how well the vehicle had been maintained.

Jim Medlin testified that he worked for the THP's Crime Investigations Division in June 2008. He introduced a recording and transcript of an interview he conducted with the Defendant at the hospital. In the interview, the Defendant said he left his house at 7:00 or 7:30 p.m. on June 9 but could not remember anything that happened thereafter until he reached the hospital. He said he had drank about a quarter of a pint of vodka that day, but had stopped drinking at 2:30 p.m.

The Defendant chose not to testify, but called TBI Special Agent and Forensic Toxicologist Tonya Horton to testify in his defense. She said that Mr. Mullins' blood test revealed Citalapram, Lidocaine, and Bupropion. The Lidocaine was most likely administered at the hospital. Citalopram is an antidepressant. Agent Horton said that all of the drugs were found in amounts at the lower end of their therapeutic range, meaning that they alone would not have been sufficient to impair Mr. Mullins.

The Defendant was convicted as charged. He now appeals.

**Analysis**

### I. Sufficiency of the Evidence

The Defendant first contends that the State presented evidence insufficient to convict him of vehicular homicide by intoxication beyond a reasonable doubt. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions

about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

For the purposes of this case, vehicular homicide by intoxication is the reckless killing of another by the operation of an automobile as the proximate result of the driver's intoxication. Tenn Code Ann. § 39-13-213(a)(2). A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the results will occur." Tenn Code Ann. § 39-11-302(c). A defendant with a blood alcohol level of .08% or more is presumed intoxicated. Tenn Code Ann. § 55-10-408.

On appeal, the Defendant identifies a number of ways in which it is logically possible that something other than his conduct proximately caused the deaths of the victims, noting that: (1) Mr. Mullins had prescription drugs in his system at the time of the crash; (2) Mr. Mullins was not wearing his seat belt; (3) hospital employees might have negligently killed Mr. Mullins; (4) the victims' Explorer might have had an undetected defect; (5) Mr. Miller's 911 call and later interview were inconsistent in some ways. It is our view that the jury properly considered the viability of these and other alternative explanations for the victims' deaths before rejecting them, instead concluding that the victims were killed by the severe injuries they sustained following the impact between the back of their automobile and the front of the intoxicated Defendant's automobile. On appeal, we are constrained to a determination of whether any rational jury could have reached this conclusion.

We conclude that the evidence is sufficient to support the Defendant's convictions of reckless homicide by intoxication beyond a reasonable doubt. It established that the Defendant had a blood alcohol level almost twice the legal limit when he chose to drive at ninety-nine miles per hour in the vicinity of other vehicles. After braking briefly, he hit the back of the victims' Explorer, which was driving straight at the time of impact. This caused the Explorer to leave the road; its passengers sustained fatal injuries. This issue is without merit.

## II. Introduction of 911 Call

The Defendant next contends that the trial court erred in admitting Mr. Miller's 911 call under the excited utterance exception to the hearsay rule. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay.

Tenn. R. Evid. 802. The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is governed by Tennessee Rules of Evidence 800-804.

The victim's hearsay statements in this case were admitted under the "excited utterance" exception to the hearsay rule. See Tenn. R. Evid. 803(2). An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id. This Court has noted that "[t]he rationale for admitting an 'excited utterance' is that the perceived event produces nervous excitement, which temporarily suspends the capacity to reflect, making the fabrication of statements about that event unlikely . . . ." State v. Michael Lebron Anderson, No. E2004-00694-CCA-R3-CD, 2005 WL 171441, at *2 (Tenn. Crim. App., Knoxville, Jan. 27, 2005) (citing State v. Gordon, 952 S.W.2d 817, 819-20 (Tenn. 1997)).

Mr. Miller's observation of the crash between the Defendant's Oldsmobile Alero and the victims' Ford Explorer qualifies as a startling event or condition, and the statements Mr. Miller made on the 911 recording concern the events surrounding the crash. Further, our review of the 911 recording reveals that Mr. Miller was distressed during the call, establishing that he was initially startled by his observation of the crash and continued to be under the stress of the excitement caused by the crash. The trial court did not err or abuse its discretion in admitting the 911 call under the excited utterance exception to the hearsay rule. This issue is without merit.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions.

_____
DAVID H. WELLES, JUDGE